```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA            :   INFORMATION

            - v. -                  :   S3 11 Cr. 93 (JSR)

CETIN AKSU,                         :

            Defendant.              :

- - - - - - - - - - - - - - - - - -X
```

COUNT ONE

(Conspiracy to Import Heroin)

The United States Attorney charges:

1.  From in or about June 2010, up to and including in or about July 2011, in Turkey, Romania, Greece, and elsewhere, CETIN AKSU, the defendant, who first entered the United States in the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2.  It was a part and an object of the conspiracy that CETIN AKSU, the defendant, and others known and unknown, would and did distribute, and possess with intent to distribute, a controlled substance, to wit, one kilogram and more of a mixture and substance containing a detectable amount of heroin, intending and knowing that such substance would be imported into the United States from a place outside thereof, in violation of Sections 959, 960(a)(3), and 960(b)(1)(A) of Title 21, United States Code.

**Overt Acts**

3. In furtherance of the conspiracy and to effect the illegal object thereof, CETIN AKSU, the defendant, and others known and unknown, committed the following overt acts, among others:

a. In or about December 2010, a co-conspirator not named as a defendant herein ("CC-1") traveled to Istanbul, Turkey, for the purpose of brokering a heroin transaction with confidential sources working for the Drug Enforcement Administration ("CS-1," "CS-2," and "CS-3" or, collectively, "the confidential sources"), at least one of whom was posing as an associate of Hizballah, which has been designated by the United States Secretary of State as a foreign terrorist organization since in or about 1997.

b. On or about December 10, 2010, in Istanbul, Turkey, CC-1 and a co-conspirator not named as a defendant herein ("CC-2") met with CS-1, CS-2, and CS-3, and discussed the importation of hundreds of kilograms of high-quality heroin into the United States. In the meeting, CC-1 and CC-2 learned from CS-1, CS-2, and CS-3 that, among other things, the profits from the sale of the heroin in the United States would be used to purchase weapons for Hizballah.

c. In or about late December 2010, CC-1 told CS-1 and CS-2 that CC-2 was ready to meet in Bucharest, Romania, in

early January 2011 to discuss (among other things) the heroin transaction described above in subparagraph (b).

   d. On or about January 12, 2011, in Bucharest, Romania, CC-1 met with CS-1 and CS-2 and discussed the importation of high-quality heroin into the United States. During that meeting, CC-1 told CS-1 and CS-2 that CC-1 had spoken to CC-2, who stated that he (CC-2) had heroin available in Turkey but that he (CC-2) would not travel to Romania.

   e. On or about January 12, 2011, CC-2 spoke on the telephone with CS-2 and discussed whether he (CC-2) could travel safely to Bucharest, Romania, and CC-2 offered to supply CS-2 with heroin in Turkey, instead.

   f. On or about January 20, 2011, CC-2 spoke on the telephone with CS-2, and CC-2 agreed to manufacture 500 kilograms of heroin for the confidential sources.

   g. On or about January 21, 2011, CC-1 spoke on the telephone with CS-2, and CC-1 agreed to meet CC-2 in or around Bucharest, Romania, in early February 2011, for the purpose of arranging a large delivery of heroin.

   h. In or about February 2011, CC-1 traveled to Istanbul, Turkey, and met with the CSs for the purpose of arranging a large delivery of heroin.

   i. On or about March 28, 2011, in Bucharest, Romania, AKSU met with CS-2 and a co-conspirator not named as a defendant herein ("CC-3"), and CS-2 explained that the heroin he

(CS-2) intended to purchase would be transported to the United States and sold there, the proceeds of which sales would benefit Hizballah.

   j. On or about April 9, 2011, in Bucharest, Romania, CC-1 received approximately $23,000 from an undercover law enforcement officer for the purpose of obtaining a one-kilogram sample of heroin for the CSs.

   k. On or about April 9, 2011, in Bucharest, Romania, CC-1 sent approximately $22,000 via hawala to CC-3, and kept $1,000 for himself as a commission for the heroin deal, for the purpose of obtaining a one-kilogram sample of heroin for the CSs.

   l. On or about April 16, 2011, in Bucharest, Romania, AKSU met with CS-2, and CS-2 explained that he was waiting to send a courier to America with a sample of the heroin that AKSU could provide.

   m. On or about April 16, 2011, AKSU offered to sell CS-1 and CS-2 25 kilograms of heroin.

   n. On or about April 21, 2011, in Bucharest, Romania, AKSU told CS-1 and CS-2 during a meeting that he had approximately 200 kilograms of heroin available for purchase.

   o. On or about April 29, 2011, in Bucharest, Romania, CC-3 delivered just under one-kilogram of heroin to the CSs.

p.  On or about May 21, 2011, during a meeting in Bucharest, Romania, between AKSU and CS-2, AKSU referred to the availability of approximately 200 kilograms of heroin.

(Title 21, United States Code, Section 963.)

### COUNT TWO

### (Conspiracy to Provide Material Support to a Foreign Terrorist Organization)

The United States Attorney further charges:

4.  From in or about February 2011, up to and including in or about July 2011, in Romania, Cyprus, Malaysia, and elsewhere, in an offense occurring in and affecting interstate and foreign commerce, begun and committed outside of the jurisdiction of any particular State or district of the United States, CETIN AKSU, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, namely, Hizballah, which has been designated by the United States Secretary of State as a foreign terrorist organization since in or about 1997.

5.  It was a part and an object of the conspiracy that CETIN AKSU, the defendant, and others known and unknown, would and did knowingly provide Hizballah with material support and

5

resources, including, among other things, weapons, explosives, and personnel, knowing that Hizballah was a designated terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that Hizballah engages and has engaged in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), and that Hizballah engages and has engaged in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989), in violation of Title 18, United States Code, Section 2339B.

Overt Acts

6. In furtherance of the conspiracy and to effect the illegal object thereof, CETIN AKSU, the defendant, and others known and unknown, committed the following overt acts, among others:

    a. On or about April 26, 2011, in Cyprus, AKSU, CC-1, and CC-2 met with CS-1 and CS-2 and discussed the purchase of weapons, including Igla surface-to-air missiles, AK-47 and M-4 rifles, and Glock handguns.

    b. In or about May 2011, CC-1 sent CS-1 and CS-2 an email that contained a list of the weapons CC-1 wished to purchase from CS-1 and CS-2, including weapons manufactured in the United States.

    c. On or about June 12, 2011, in Kuala Lumpur, Malaysia, CC-2 and AKSU met with CS-1 and CS-2 and discussed the

purchase of weapons, Igla surface-to-air missiles, AK-47 rifles, and American-made Stinger surface-to-air missiles, M107 .50 caliber sniper rifles, and M-4 rifles. During that discussion, CS-2 advised CC-1 and CC-2 that the Stinger missiles would be obtained from an American base in Germany.

       d.    During the meeting on or about June 12, 2011, CC-1 stated that he was purchasing the weapons on instructions from Hizballah.

       e.    On or about June 13, 2011, in Kuala Lumpur, Malaysia, CC-1 and AKSU signed a written contract for the purchase of 48 Stinger surface-to-air missiles, 100 Igla surface-to-air missiles, 5,000 AK-47 rifles, 1,000 M4 rifles, and 1,000 Glock handguns, for a total price of approximately $9.5 million.

       f.    On or about June 28, 2011, in Beirut, Lebanon, CC-1 and co-conspirators not named as defendants herein caused approximately $50,000, as a down payment for the purchase referenced in subparagraph (e), to be sent to the CSs.

       g.    On or about June 29, 2011, in Beirut, Lebanon, CC-1 and co-conspirators not named as defendants herein caused approximately $50,000, as a further down payment for the weapons purchase referenced in subparagraph (e), to be sent to the CSs.

      (Title 18, United States Code, Sections 2339B(a)(1),
           (d)(1)(C), (d)(1)(E) and 3238.)

## COUNT THREE

### (Conspiracy to Acquire, Transfer, and Possess Anti-Aircraft Missiles)

The United States Attorney further charges:

7. From in or about February 2011, up to and including in or about July 2011, in Romania, Cyprus, Malaysia, and elsewhere, in an offense occurring in and affecting interstate and foreign commerce, begun and committed outside of the jurisdiction of any particular State or district of the United States, CETIN AKSU, the defendant, who was first brought to and arrested in the Southern District of New York, and others known and unknown, and in an offense committed against property that was owned, leased, and used by the United States and by a department and agency of the United States, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to acquire, transfer directly and indirectly, receive, possess, import, and export: (a) an explosive and incendiary rocket and missile that is guided by a system designed to enable the rocket and missile to seek and proceed toward energy radiated and reflected from an aircraft and toward an image locating an aircraft, and otherwise direct and guide the rocket and missile to an aircraft; (b) a device designed and intended to launch and guide said rocket and missile; and (c) a part and combination of parts designed and redesigned for use in assembling and fabricating said rocket, missile, and device.

8. It was a part and an object of the conspiracy that CETIN AKSU, the defendant, and others known and unknown, would and did knowingly acquire, transfer directly and indirectly, receive, possess, import, and export surface-to-air guided missile systems, some of which were manufactured in the United States and that were represented to be the property of the United States, in violation of Title 18, United States Code, Section 2332g.

### Overt Acts

9. In furtherance of the conspiracy and to effect the illegal object thereof, CETIN AKSU, the defendant, and others known and unknown, committed the overt acts set forth in Count Two of this Information, which are fully incorporated by reference herein.

(Title 18, United States Code,
Sections 2332g(a)(1), (b)(1), (b)(4), (b)(5), (c)(1) and 3238.)

9

## COUNT FOUR

(False Declarations Before a Court)

The United States Attorney further charges:

10. In or about February 2012 and in or about April 2012, in the Southern District of New York, CETIN AKSU, the defendant, under oath, and in a declaration, certificate, affirmation, and statement made under penalty of perjury as permitted under section 1746 of Title 28, United States Code, in a proceeding before a court of the United States, knowingly and intentionally made two or more false material declarations, to wit, and among other things, AKSU made false statements in connection with his motion to suppress his post-arrest statements.

(Title 18, United States Code, Sections 1623(a) and (c)).

## FORFEITURE ALLEGATION AS TO COUNT ONE

11. As a result of committing the controlled substance offense alleged in Count One of this Information, CETIN AKSU, the defendant, shall forfeit to the United States, pursuant to 21 U.S.C. § 970, any and all property constituting and derived from any proceeds that the defendant obtained directly and indirectly as a result of the said violation and any and all property used and intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Count One of this Information, including but not limited to, a sum of money

10

representing the amount of proceeds obtained as a result of the offense described in Count One of this Information.

### Substitute Assets Provision

12. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 970, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

(Title 21, United States Code, Sections 963 and 970.)

## FORFEITURE ALLEGATION AS TO COUNTS TWO AND THREE

13. The allegations contained in Counts Two and Three of this Information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(G), and Title 28, United States Code, Section 2461(c).

14. The violations of Title 18, United States Code, Sections 2332B and 2332g, alleged in Counts Two and Three of this Information were Federal crimes of terrorism, as defined in 18 U.S.C. § 2332b(g)(5), against the United States and its property.

15. CETIN AKSU, the defendant, was engaged in planning and perpetrating a Federal crime of terrorism against the United States and its property.

16. Upon conviction of any of the offenses in violation of Title 18, United States Code, Sections 2332B and 2332g, alleged in Counts Two and Three of this Information, CETIN AKSU, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(G)(i), and Title 28, United States Code, Section 2461(c), all right, title, and interest in all assets, foreign and domestic, derived from, involved in, and used and intended to be used to commit a Federal crime of terrorism against the United States, citizens and residents of the United States, and their property.

17. Upon conviction of any of the offenses in violation of Title 18, United States Code, Sections 2332B and 2332g, alleged in Counts Two and Three Two of this Information, CETIN AKSU, the defendant, shall pay to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(G), and Title 28, United States Code, Section 2461(c), and a money judgment equal to the value of the assets subject to forfeiture.

(Title 18, United States Code, Section 981(a)(1)(G) and Title 28, United States Code, Section 2461(c).)

*Preet Bharara*
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

CETIN AKSU

Defendant.

## INFORMATION

S3 11 Cr. 93 (JSR)

(Title 18, United States Code, Sections 2339B, 2332g, 1512(c) & (i), 3238, 981(a)(1)(G), & 1623; Title 21, United States Code, Sections 963 & 970; and Title 28, United States Code, Section 2461(c).)

PREET BHARARA
United States Attorney.