UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | (S1) 11 Cr. 93-01 (JSR) |
| ) | Sentencing scheduled for: |
| SIAVOSH HENAREH, ) | February 27, 2013 |
| ) | |
| ) | |
| Defendant. ) | |
| ) | |

**SENTENCING MEMORANDUM IN SUPPORT OF
A VARIANCE PURSUANT TO 18 U.S.C. § 3553(a) AND FOR A DOWNWARD
DEPARTURE PURSUANT TO §§ 2D1.1 and 5K2.0(a)**

PRYOR CASHMAN LLP
Attorneys for Defendant
7 Times Square
New York, New York  10036-6569
(212) 421-4100

*Of Counsel:*
  Robert W. Ray
  Madelon A. Gauthier

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .................................................................................................................1

    I.    BACKGROUND ................................................................................................1

    II.   OFFENSE CONDUCT .......................................................................................2

    III.  SENTENCING GUIDELINES CALCULATION ............................................4

    IV.  ARGUMENT FOR VARIANCE OR
          DOWNWARD DEPARTURE UNDER § 2D1.1 ..................................................4

        A.  Unusually Low Purity Of The Sample ........................................................5

        B.  190 Kilograms of Predominately Fake Heroin Overstate The Scale of Offense ........6

    V.   VARIANCE PURSUANT TO SECTION 3553(a) FACTORS .......................9

CONCLUSION ....................................................................................................................10

# TABLE OF AUTHORITIES

**CASES**  **PAGE(s)**

*United States v. Chalarca,*
   95 F.3d 239 (2d Cir. 1996)......................................................................................7

*United States v. Griffiths*,
   954 F. Supp. 738 (D. Vt. 1997)................................................................................7

*United States v. Restrepo*,
   802 F. Supp. 781 (E.D.N.Y. 1992), *vacated on other gds.*,
   999 F.2d 640 (2d Cir. 1993).....................................................................................5

*United States v. Rodriguez*,
   97 Cr. 1053, 2002 U.S. Dist. LEXIS 17588 (S.D.N.Y. Sept. 18, 2002)...............6

*United States v. Rosado-Ubiera,*
   947 F.2d 644 (2d Cir. 1991).....................................................................................5

*United States v. Rubirosa*,
   No. 95-1200, 1996 U.S. App. LEXIS 2034 (2d Cir. Feb. 9, 1996) ......................5

**STATUTES**

18 U.S.C. § 2332g...............................................................................................................2

18 U.S.C. § 2339(b) ............................................................................................................2

18 U.S.C. § 3553(a) ...............................................................................................9, 10, 11

18 U.S.C. § 3553(a)(1).......................................................................................................9

18 U.S.C. § 3553(a)(2).....................................................................................................10

18 U.S.C. § 3553(a)(2)(D) ...............................................................................................10

21 U.S.C. § 959...................................................................................................................1

21 U.S.C. § 960(a)(3).........................................................................................................1

21 U.S.C. § 960(b)(1)(A) ...............................................................................................1, 4

21 U.S.C. § 963...............................................................................................................1, 4

| **SENTENCING GUIDELINES** | **PAGE(s)** |
|---|---|
| U.S.S.G. § 2D1.1 | 4, 5, 10, 11 |
| U.S.S.G. § 2D1.1(a)(5) | 4 |
| U.S.S.G. § 2D1.1(c)(1) | 4 |
| U.S.S.G. § 2D1.1, Application Notes 5 | 4, 6, 7, 8 |
| U.S.S.G. § 2D1.1, Application Notes 26 | 4, 5 |
| U.S.S.G. 5K2.0(a) | 7 |

**INTRODUCTION**

Defendant Siavosh Henareh ("Defendant" or "Mr. Henareh") submits the following sentencing memorandum in support of a variance and downward departure for this Court to fashion a just and appropriate sentence.

Mr. Henareh is scheduled to be sentenced on February 27, 2013, in connection with a guilty verdict on one count following a jury trial. Trial commenced on November 12, 2012 on a one-count superseding Indictment charging conspiracy to violate Title 21, United States Code, §§ 959, 960(a)(3) and 960(b)(1)(A), that is, importation of in excess of one kilogram heroin. On November 27, after six days of trial, Mr. Henareh was found guilty of the heroin importation conspiracy offense under 21 U.S.C. § 963 in an amount exceeding one kilogram.

The Probation Office has submitted its Presentence Report ("PSR") and calculated the offense level at 38 and criminal history category I for a guidelines sentencing range of 235 to 293 months' imprisonment, recommending instead a sentence of 180 months by a variance and/or downward departure as described below.

It is respectfully submitted that Mr. Henareh be sentenced within the range of 121-151 months' imprisonment at offense level 32, as explained below, which reflects a sentencing variance or downward departure based on both the unusually low purity of the heroin sample provided for which he was convicted, and the fake composition of the much larger quantity of "heroin" which has been, we submit, unfairly attributed to him.

**I.    BACKGROUND**

Mr. Henareh was born in Iran in 1957. PSR ¶ 44. In 1979, at age 22, he left Iran as a consequence of the Iranian revolution and fled to Bucharest, Romania where he attended college

1

and medical school. PSR ¶¶ 46, 47, 67. He has lived in Bucharest for the past 32 years now with a wife and an eight-year old son. PSR ¶¶ 47, 53.

Mr. Henareh was arrested on July 25, 2011, in Bucharest as a result of a joint investigation with U.S. Drug Enforcement Administration (DEA) and the Romanian National Police (RNP). After his arrest, Mr. Henareh was detained by RNP for four months and then flown to the United States on a DEA chartered flight to White Plains, New York on November 17, 2011, pursuant to an order of extradition. He has no previous experience with the criminal justice system of the United States and indeed has never been in the United States before his extradition and subsequent appearance in this case. The three-count Indictment also charged two co-conspirators, Cetin Aksu and Bachar Wehbe, with additional criminal conduct, specifically, a terrorism offense in violation of Title 18, United States Code, §§ 2339(b) and 2332g. PSR ¶¶ 3, 4. Mr. Henareh's trial was severed from Aksu and Wehbe on April 30, 2012 by a Memorandum Order (Rakoff, J.) of this Court. Subsequently, Aksu and Wehbe pleaded guilty and are awaiting sentencing. Aksu testified against Mr. Henareh at his trial on November 20, 2012.

## II.     OFFENSE CONDUCT

The offense conduct charged Mr. Henareh with facilitating the delivery of approximately a one-kilogram (actually 937 grams) sample of heroin from Bucharest, Romania which was anticipated as a pre-cursor to a larger shipment to be provided by an international group of drug suppliers and destined for the United States, as well as other countries. PSR ¶ 18. On April 23, 2011, Mr. Henareh received $23,000 in cash from an undercover RNP officer in Bucharest and transmitted the money by halawa to Turkey. PSR ¶ 18. Two weeks later the sample of heroin was delivered to confidential sources from the DEA and RNP in Romania. *Id*. The sample was

determined to contain 937 grams of heroin with a 3.1% purity concentration. The amount and purity was stipulated to by the Government and Defendant before trial.

In late July 2011, Mr. Henareh was one of the targets of a sting operation conducted by DEA and RNP who were arranging the €2.85 million purchase of a 189 kilogram shipment of heroin in Romania from the international suppliers. PSR ¶ 19. Throughout the trial, Mr. Henareh was depicted as a middleman who introduced certain drug suppliers to the CSs who were the purchasers. At trial, the Government introduced conversations of recorded meetings and phone calls spanning from December 2010 to July 2011 between a number of CSs and different suppliers, in which a proposed shipment of heroin was discussed. PSR ¶¶ 12, 19. These conversations and meetings took place in Turkey, Greece and Romania and – as revealed in the transcripts of the conversations provided by the Government – the participants spoke in Arabic, Turkish, Farsi and Romanian. The trial testimony showed that Mr. Henareh was present at some but not all of these meetings and never explicitly confirmed the heroin shipment or its quantity. He spoke on relatively few occasions and never acknowledged in these conversations that the destination for any of the heroin was the United States.

Mr. Henareh and other co-conspirators, along with participating CSs, were arrested upon the delivery by an undercover RNP officer of the €2.85 million to Mr. Henareh's house in Bucharest on July 25, 2011. PSR ¶¶ 22, 23. However, the 189 kilograms of "heroin" bricks ultimately delivered by the suppliers and seized by RNP and DEA turned out to be sham "heroin" and instead consisted of sand, containing no actual heroin at all. PSR ¶ 23. It is unknown if the other international suppliers who attended the meetings and/or who presumably provided the sham "heroin" bricks in the transaction were ever arrested or prosecuted.

### III. SENTENCING GUIDELINES CALCULATION

The mandatory minimum term of imprisonment for a violation of 21 U.S.C. §§ 960(b)(1)(A) and 963 is 10 years and the statutory maximum is life. *See also* U.S.S.G. § 2D1.1(a)(5). PSR ¶¶ 30, 66. Mr. Henareh has no criminal history and the guideline range for violation of § 21 U.S.C. 963 (heroin importation conspiracy) is 235-293 months' imprisonment. PSR ¶¶ 42, 67. Under the U.S.S.G., Mr. Henareh is accountable for conspiring to import 190 kilograms of heroin and thus pursuant to the Drug Quantity Table in § 2D1.1(c)(1), he has for a first offense a base offense level of 38. PSR ¶ 30. He has received no adjustments for his relative role in the offense and because he took the stand in his own defense at trial, he has not received an adjustment for acceptance of responsibility; thus his total adjusted offense level is 38. PSR ¶¶ 33, 34, 36, 38.

### IV. ARGUMENT FOR VARIANCE OR DOWNWARD DEPARTURE UNDER § 2D1.1

As discussed below, Mr. Henareh contends that a variance or downward departure is warranted and objects to the full attribution of the 190 kilogram quantity of heroin as it overstates the true nature of his offense because, of that total amount, only slightly more than three (3) *grams* constituted heroin at all. Moreover, the entire negotiated transaction was arguably the product of deceit by the suppliers; thus it is entirely possible there was never any intention by Mr. Henareh or others to ever deliver such a quantity of heroin. And, in fact, the only real heroin seized in this operation (937 grams) was of an unusually low purity of 3.1%, a concentration not associated with large-scale or wholesale distribution. Thus, pursuant to U.S.S.G. § 2D1.1, a variance or a downward departure may be warranted. U.S.S.G. § 2D1.1, Application Notes 5 and 26.

4

A.     **Unusually Low Purity Of The Sample**

The same sentencing consideration under U.S.S.G. § 2D1.1 which may warrant an upward departure for unusually high purity levels of heroin should be considered in this case involving a sample which contained an unusually low purity of heroin of only 3%. Application Note 26 explains that the purity of a drug, particularly in the case of heroin, may be relevant at sentencing since it is often indicative of the defendant's proximity and role in the chain of distribution. U.S.S.G. § 2D1.1, App. Note 26. Given that drugs are typically diluted as passed down the chain of distribution, when a defendant possesses an unusually pure quantity of narcotics this may reveal a larger role in the conspiracy/operation. *Id*.

Courts have recognized their inherent authority under § 2D1.1 to apply the converse; that is, to downwardly depart (pre-*Booker*) for narcotics of unusually low purity. *United States v. Rubirosa*, No. 95-1200, 1996 U.S. App. LEXIS 2034, at *13 (2d Cir. Feb. 9, 1996) (affirming district court's recognition of its authority under § 2D1.1 to downwardly depart based on low purity of 21% but chose not to do so given volume of heroin involved). *See also United States v. Rosado-Ubiera*, 947 F.2d 644, 645 (2d Cir. 1991) (court stated intention to grant downward departure based on low purity of cocaine without reference to § 2D1.1); *United States v. Restrepo*, 802 F. Supp. 781, 792 (E.D.N.Y. 1992), *vacated on other gds.*, 999 F.2d 640 (2d Cir. 1993) (and overruled on other grounds) (rejecting argument that low purity is not valid consideration for sentencing reduction). In Mr. Henareh's case, the § 2D1.1 reverse argument should apply as the sample was only 3% pure, an unusually low concentration acknowledged as such at trial by the Government's own expert witness on global heroin distribution techniques, and not typical for large-scale or wholesale distribution. If anything, such a low purity reveals that Mr. Henareh as a middleman had a role at the very end of the distribution chain, distant from

the suppliers. This is also consistent with the testimony demonstrating Mr. Henareh merely introduced certain alleged suppliers to the CSs and did not actively participate in any of the transactions.

### B. 190 Kilograms of Predominately Fake Heroin Overstate The Scale of Offense

The 189 kilograms of "heroin" bricks that were recovered on July 25, 2011 were made of sand and this large quantity should not be fully attributed to Mr. Henareh's sentencing determination because it does not fairly reflect his conduct. U.S.S.G. § 2D1.1, Application Note 5 advises that for agreements to sell a drug in which there are inconsistencies in the quantity of drug seized versus the agreed-upon amount, or no drug is seized, sentencing courts should consider the amount actually delivered in order to reflect the scale of a defendant's offense. Specifically, "[i]n an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense." U.S.S.G. § 2D1.1, App. Note 5. The sentencing judge is in the best position (and has the authority) to determine the most accurate quantity to reflect the offense when there are such inconsistencies. *See, e.g., United States v. Rodriguez*, 97 Cr. 1053, 2002 U.S. Dist. LEXIS 17588 (S.D.N.Y. Sept. 18, 2002) (McKenna, J.). In *Rodriguez*, the court determined that 10-20 grams of heroin was a more accurate amount to reflect defendant's role and understanding of the transaction when no drugs were ultimately delivered, he was a mere broker or middleman and did not know nor could reasonably foresee a 700 gram amount agreed upon by others. *Id.* at **12-15. Mr. Henareh, like the defendant in *Rodriguez*, was not told nor did he specifically acknowledge the price or amount to be delivered, and indeed the trial testimony never demonstrated an explicit conversation or agreement between, and much less any authority by Mr.

6

Henareh, the CSs and the suppliers about these terms. *Id*. at *13, 14 (referencing *United States v. Chalarca,* 95 F.3d 239, 245 (2d Cir. 1996)).

The trial testimony demonstrated that communications were made in Mr. Henareh's presence, but he was far from the individual "turning" the deal. One's actual role in a narcotics transaction can be a mitigating factor in the totality of the circumstances under U.S.S.G. 5K2.0(a) to justify a downward departure. *See, e.g., United States v. Griffiths*, 954 F. Supp. 738, 743 (D. Vt. 1997) (downward departure warranted considering mitigating factors under § 5K2.0 for first time offender whose function was middleman in LSD sale). Recognition of this uncertainty as to Mr. Henareh's knowledge of what would be delivered and his awareness of the scope of the transaction warrant consideration in mitigation and counsel in favor of a sentencing departure or variance below what would otherwise be full accountability for 190 kilograms of heroin at sentencing.

Not only did Mr. Henareh arguably not foresee the 190 kilogram quantity, but the multiple kilograms of heroin never materialized in Bucharest on July 25, 2011. Thus, ultimately, the agreed-upon amount – a quantity arranged exclusively by the suppliers and the CSs – was much larger than the actual amount delivered, which was zero. No heroin was delivered and no drugs were seized other than the one-kilogram sample. These facts should be considered at sentencing pursuant to Application Note 5 when determining an amount which more accurately reflects the scale of the offense attributable to Mr. Henareh. The Guidelines calculation of 235-293 months' imprisonment, which holds Mr. Henareh accountable for a quantity which was ultimately never produced, leads to overstating the seriousness of his offense and an excessive sentencing calculation which is unwarranted.

7

The Guidelines also analogously instruct that the Court may exclude from its offense level determination an amount of drugs if a defendant establishes he did not intend to provide or purchase or was not capable of providing such an amount. "If, however, the defendant establishes that [he] did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes [he] did not intend to provide or purchase or was not reasonably capable of providing or purchasing." § 2D1.1 App. Note 5. The Probation Office has determined, as set forth in the PSR, that Mr. Henareh did not have "the ability to acquire actual heroin as promised." PSR p. 18 (Sentencing Recommendation). In recommending a downward variance to a sentence of 180 months' imprisonment, the Probation Office has acknowledged that as a middleman, Mr. Henareh did not ever supply the 190 kilograms and at best was capable, and thus accountable, for only a portion of this amount. PSR p. 19. It is evidently possible that the suppliers planned the apparent double-cross of the transaction to dupe the CSs and deliver fake bricks of "heroin." It may be that the suppliers got "spooked" and decided to terminate the transaction. Although not argued at trial, it is also entirely possible that the suppliers never intended to deliver 190 kilograms of heroin. Simply put, it is unclear why the deal failed; the sellers were never produced in court and their intention to provide sham or real drugs in the transaction was never determined. Because Mr. Henareh's intention and capability to provide this large amount of heroin is plainly not certain, it is unfair to simply conclude that Mr. Henareh is responsible for this entire amount.

## V. VARIANCE PURSUANT TO SECTION 3553(a) FACTORS

The Court should conduct an analysis of the appropriate sentence for Mr. Henareh, pursuant to the sentencing factors found in 18 U.S.C. § 3553(a). That is, the sentence imposed should be "sufficient, but not greater than necessary. …" 18 U.S.C. § 3553(a). Those factors begin by instructing the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" when determining an appropriate sentence. 18 U.S.C. § 3553(a)(1). The goals of sentencing mandate that an appropriate sentence should reflect both the seriousness of the offense and provide just punishment. *Id.*

Mr. Henareh had never stepped foot in the United States prior to November, 2011 and was plucked from Bucharest, after a DEA investigation heavily sourced and funded by CSs and which ultimately yielded sham drugs, and then placed on a chartered flight to New York where he faced charges of conspiracy to import hundreds of kilograms of heroin into the United States. As someone completely unfamiliar with this country's criminal justice system and much less the U.S. Constitution and its protections, he has struggled throughout trial and pretrial proceedings in understanding the procedures and rights and protections he is entitled to.

Mr. Henareh, who operated his natural foods and homeopathic import/export business, was the sole source of financial support for his wife and young son in Bucharest. PSR ¶¶ 69, 51. Since his arrest and detention pending these proceedings, his wife has taken in other family members to help her provide for her family. PSR ¶¶ 51, 52. An extended sentence will put an unusually high burden on Mr. Henareh's family resources and future. In addition, an excessive sentence such as the one suggested by the Guidelines will effectively result in Mr. Henareh missing the entire childhood and adolescence of his eight year old son.

In addition, when fashioning an appropriate and just sentence, the Court must consider the need for the sentence imposed "to provide the defendant with needed educational or vocational training, **medical care**, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D) (emphasis supplied). Mr. Henareh is now age 55, his health has deteriorated since his arrest in 2011 and he also suffers from hypertension. PSR ¶¶ 55, 57. He is currently taking various medications for high blood pressure and suffers from an enlarged prostate, for which he is awaiting treatment due to delay in retrieving his medical records from Romania and a complete assessment at MCC by medical personnel. It is highly likely that for a 55-year old man in poor health, any sentence of 15 years or more will be tantamount to a life sentence.

Given all of these circumstances and the substantial negative impact Mr. Henareh's incarceration will have on his family, it is respectfully submitted that a sentence within the range of 121-151 months' imprisonment would be more than "sufficient, but not greater than necessary…" to satisfy the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

This Court should consider a variance and downward departure in order to arrive at a fair sentence for Mr. Henareh. A sentence of 180 months' imprisonment is still excessive and unwarranted. Rather, fair consideration by this Court should be given to fashioning an appropriate sentence.

## CONCLUSION

Mr. Henareh objects to a sentence of 180 months' imprisonment otherwise recommended by the Probation Office without further consideration of the low purity of the only actual drugs which were seized in his case, and the unfairness of holding him accountable for 190 kilograms of largely sham "heroin" which does not accurately reflect the scale of the offense. Instead, and

pursuant to the authority in § 2D1.1 in varying below the Probation Office's recommendation of 180 months' imprisonment, Defendant respectfully submits that a sentence within the range of 121-151 months' imprisonment is more than sufficient, fair and reasonable under § 3553(a).

For the foregoing reasons, defendant Siavosh Henareh therefore respectfully requests that this Court impose a sentence within the range of 121-151 months at offense level 32 in lieu of 180 months, as recommended by the Probation Office.

Dated: New York, New York
February 20, 2013

PRYOR CASHMAN LLP

By: _____/s/ Robert W. Ray_____

Robert W. Ray
Madelon A. Gauthier
7 Times Square
New York, New York  10036-6569
(212) 421-4100
*Attorneys for Defendant Siavosh Henareh*